UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DEIDRE DENNIS and
WILLIAM BONVIE,
on behalf of themselves and all others
similarly situated,

Plaintiffs,

v.

MYLIFE.COM, INC.

Defendant

No. 20-

CLASS ACTION

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

### I.     INTRODUCTION

1. This is a class action brought under the federal Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq*. ("FCRA"), the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. §§ 56:12-14 *et seq*. ("TCCWNA"), the New Jersey common law right of publicity, and the New Jersey right of privacy.

### II.    JURISDICTION AND VENUE

2. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. §§ 1331, 1337.   Supplemental jurisdiction is provided under 28 U.S.C. § 1367.

3. Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

### III.   PARTIES

4. Plaintiff Deidre Dennis is an adult individual residing in Jersey City, New Jersey.

5. Plaintiff William Bonvie is an adult individual residing in Tuckerton, New Jersey.

6. Plaintiffs are consumers as that term is defined in FCRA section 1681a(c).

7. Defendant MyLife.com, Inc. ("Defendant" or "MyLife"), is a Delaware corporation with headquarters located at 1100 Glendon Avenue, Los Angeles, California 90024-3511.

### IV.   FACTUAL ALLEGATIONS

**A.   The Fair Credit Reporting Act Regulates Defendant's Conduct**

8. Congress enacted the FCRA because "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers" and "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(3)-(4).

9. The FCRA regulates consumer reporting agencies (CRAs), which the FCRA defines as:

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

10. Under the FCRA, a "consumer report" is:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for – credit or insurance to be used primarily for personal, family, or household purposes; employment purposes; or any other purpose authorized under [15 U.S.C. § 1681b].

15 U.S.C. § 1681a(d)(1).

11. MyLife is in the business of selling information about American citizens over the Internet to the general public, through its website, mylife.com. The information is assembled and

particularized about specific individuals such as Plaintiffs and then is furnished and/or sold by Defendant to third parties (herein, individualized "reports").

12. MyLife calls itself "the only reputation platform focused on making consumers safer and marketplaces more trusted through proprietary Reputation Profiles & Scores. We are also dedicated to helping people manage and monitor their own reputation to help them look their best, personally and professionally, to the people searching for them online." *Id.*

13. MyLife markets itself to the public by posting that "Your Reputation Matters. Your reputation is more important than credit. Your credit score says only one thing about you, your reputation says everything about you. People use your credit score for one thing — whether to lend you money. People use your reputation to decide everything — whether they want do business with you, be friends with you, live with you, date you and much more. Maintaining a good reputation, every day, is a critical part of everyone's life. We want to help you show the world how great you are to improve your life personally and professionally." *Id*.

14. MyLife creates "Reputation Profiles & Scores" that it represents that its reports "can include everything that affects someone's reputation. That could consist of Criminal and Civil Court Records, lawsuits, liens, judgements, income, property records, social media, work & education history, photos, personal reviews, and complete contact details. MyLife Reputation Profiles show up in over 300 million online searches every month." *Id*.

15. MyLife assigns a "Public Reputation Score" to "everyone" on their individualized reports and describes how it comes up with that score: "Only MyLife provides everyone's public Reputation Score. These scores are based on background details, personal reviews and social media posts, and are constantly updated. They provide a quick method to assess anyone. These scores also appear in over 300 million online searches every month." The Reputation Scores that MyLife

assigns to "everyone" range up to a score of 5, with the example of 2.89 being classified as "poor." *Id.*

16. Defendant promises to provide consumers with "access to tools to increase your [reputation] score and improve the way you present yourself online so you can look your best to everyone that searches for you … someone could be searching to check your reputation right now." *Id.*

17. MyLife knows, and advises the public, that the information it provides is used by people for many purposes, including extension of credit, collection of accounts, employment purposes, insurance underwriting, evaluating or assessing existing credit obligation and other business purposes: "People use your reputation to decide everything — whether they want do business with you, be friends with you, live with you, date you and much more." *Id.*

18. In fact, MyLife directly markets a "free employer account" to individuals who "Work in HR or Marketing," warning that "No one gets a job with a bad Reputation." MyLife encourages consumers to "See & Raise your Reputation Score" by clicking on its site. *See* Exhibit 1.

19. MyLife markets a YouTube style video that emphasizes its knowledge that the information it provides is used for hiring decisions. *See* Exhibit 2, https://www.facebook.com/watch/?v=422874128376345/ ("Hi, guys, I want to talk with you about something..." and then goes on to tell how to use MyLife to screen people you are interested in hiring).

20. MyLife urges consumers to "[c]ontrol how you look to employers … to build your personal and professional reputation." *See* Exhibit 3, MyLife Protect & Improve Your Reputation.

21. MyLife has submitted a trademark application in which it admits that its computer services include the "posting and transmission of messages concerning … employment searches." *See* Exhibit 4.

22. MyLife thus promotes itself as knowingly and deliberately gathering information and preparing reports that bear upon a consumer's character, general reputation, personal characteristics or mode of living.

23. MyLife gathers and sells information concerning consumers without the consent of the consumers.

24. MyLife's purpose behind furnishing reports concerning searched individuals is to advertise its service of providing details about the person's identity, character and reputation for purposes such as hiring.

25. Certain information specific to each consumer about whom MyLife has created a profile is available without charge to the general public, including such information as date of birth, income, political affiliation, ethnicity, salary, net worth, religious views and marital relationship. In order to see more details about one's own or another person's "Reputation Score," a consumer is required to purchase a subscription to MyLife ranging in cost from $1.00 for a one-week trial period to $56.85 for a three-month period, or more.

26. MyLife gathers, assembles and evaluates consumer credit or other information for the purpose of furnishing reports to third parties, and sells that information about millions of consumers.

27. MyLife's activities are governed by the Fair Credit Reporting Act.

28. MyLife does not follow reasonable procedures to assure the maximum possible accuracy regarding the information that it sells about consumers.

29. Instead, MyLife gathers the information from other sources and advises consumers that "we cannot fully guarantee its accuracy."  *See* Exhibit 5.

30. The information that MyLife gathers about individuals is not authorized by those individuals.

31. A resident of New Jersey has the right to prevent unauthorized, commercial appropriation of his or her name or likeness.

32. MyLife's unauthorized use, for a commercial purpose, of an individual's name or likeness harms that individual by diluting the value of the name and depriving the individual of compensation derived from the use of that name or likeness.

33. The information about consumers published by MyLife also invades the privacy of consumers protected by New Jersey law by publicly disclosing private facts, such as the purported income, net worth or religion of the consumer.

34. In particular, the disclosure of a person's "net worth," by the nature of the term, is inaccurate.

35. In general, the definition of an individual's net worth is the value of the individual's assets minus liabilities.  *See* https://www.accountingtools.com/articles/2017/5/12/net-worth.

36. An individual's assets include cash, personal investments, resale of a house or an automobile, furnishings, or jewelry, while liabilities include credit card debt, student loans, car loans and mortgage debt.  *Id.*; *see also* https://www.investopedia.com/terms/n/networth.asp.

37. MyLife does not know how much cash an individual might have in a bank account, the value of personal investments, the resale value of any property, their retirement savings, their jewelry or other assets.

38. Nor does MyLife know exactly what liabilities an individual might have, or the value of those liabilities.

39. MyLife therefore lacks the detailed information about an individual that could result in an accurate calculation of that individual's net worth.

40. Nonetheless, MyLife deliberately and recklessly purports to disclose to the public a private individual's "net worth."

41. The harm arising from such disclosures is self-evident. MyLife's public disclosure of that information could be used to extort or otherwise target an individual with a purported high net worth. Conversely, a low purported net worth could subject the individual to embarrassment or ridicule or serve as a disqualifying factor in decisions taken by others in reliance on the inaccurate representations by MyLife.

42. MyLife periodically changes the information available at its website, but at all times material hereto, MyLife has published and continues to publish information about consumers that violates their rights under the Fair Credit Reporting Act and New Jersey law.

43. Thus, Defendant is a CRA because, for a fee, it regularly engages in the practice of assembling "personal characteristic" information for the purpose of furnishing reports to third parties who use the information for purposes that are permissible under the FCRA, including but not limited to employment purposes.

**B.     The Experience of the Plaintiffs**

**Deidre Dennis**

44. Deidre Dennis is a senior contract administrator with an engineering firm.

45. Her personal and professional reputation is important to her.

46. On or about December 21, 2019, Ms. Dennis viewed the MyLife website and learned what MyLife was reporting about her to third parties who obtained her report and to the general public through mylife.com.   *See* Exhibit 6 hereto.

47. The MyLife website assigned Ms. Dennis a Reputation Score of 2.63-4.13 / 5.   *Id*.

48. The website also stated that Ms. Dennis's "ethnicity is Caucasian."   *Id*.   This representation is not accurate; Ms. Dennis is African American.

49. The website further purported to quantify Ms. Dennis's salary and her net worth and invited the public to "View All Details."   *Id*.

50. MyLife lacked sufficient information to accurately calculate the amount of Ms. Dennis's net worth.

51. MyLife's representations concerning Ms. Dennis's salary and net worth were inaccurate.

52. The MyLife website implied that Ms. Dennis "may have Arrest or Criminal Records. Check Full Background Report to see possible **arrest or conviction records** we have found on Deidre."   *Id*. (Emphasis in original).

53. That representation was followed by a highlighted link to "View Deidre's Court, Arrest or Criminal Records."   *Id*.

54. Ms. Dennis has no arrest or criminal records.

55. The MyLife website implied that Ms. Dennis "may have Sexual Offenses.  **Check Full Background Report** to see a list of any and all **sex offenses** Deidre may have been convicted of and her **current sex offender status** if applicable."   *Id*. (Emphasis in original).

56. That representation was followed by a highlighted link to "View Deidre's Sex Offender Records."   *Id*.

57. Ms. Dennis has no sex offender record.

58. MyLife implied that "Deidre may have records indicating she has been evicted from her home" and invited viewers to "View Deidre's Eviction Records." *Id.*

59. Ms. Dennis has never been evicted from her home.

60. Defendant improperly used Ms. Dennis' name to its commercial advantage without her consent, disclosed private financial and other information about Ms. Dennis to the general public and improperly furnished reports about Ms. Dennis with inaccurate income, net worth and other information, harming her reputation.

**William Bonvie**

61. Plaintiff William Bonvie is a self-employed free-lance writer.

62. Mr. Bonvie earns a living as a writer by working for newspapers, nonprofits and other organizations that need professional writing, reporting and editing. He mostly looks for opportunities online, and for a number of months signed onto a service that takes a percentage of whatever amount of money an applicant may end up getting paid.

63. Mr. Bonvie's public reputation for integrity is one of his most important assets in his continued ability to make a living as a journalist, author and blogger, and any insinuation that his reputation is less than "good" and that he has blemishes on his record would keep him from being hired or published.

64. In December 2018, Mr. Bonvie discovered that MyLife, without his permission, had appropriated his name and also his likeness and posted it on the MyLife website as part of his "Reputation Profile." *See* Exhibit 7.

65. In addition, MyLife assigned Mr. Bonvie a "Reputation Score" of 3.08 out of 5. *Id.*

66. MyLife's Reputation Profile of Mr. Bonvie further disclosed information regarding his home address, date of birth, income, net worth, political affiliation, ethnicity, religion, marital status and relationships.  Not only was much of this private information, but some of it was inaccurate – for example, identifying him as a "Pacific Islander," listing associates with whom he was totally unacquainted (some of whom had lawsuits and various blots on their "reputation") and claiming that he was "related" to a friend and former classmate who is also a writer.

67. MyLife's Reputation Profile of Mr. Bonvie included an "Alert!" that stated "Lawsuits, Liens or Bankruptcies records found Mr. Bonvie's Background Report!" and "Criminal or Civil Court records found on Mr. Bonvie's Family, Friends, Neighbors, or Classmates!"   *Id.*

68. In a highlighted, bright red "alert" section, MyLife advised Mr. Bonvie as follows: "Bill, We Found Negative Items On Your Reputation Profile."   *Id.*

69. MyLife offered to let Mr. Bonvie see "Your Reputation Profile" and "Improve Your Public Reputation Score, Be Alerted when People Search for You, Remove Your Info from Negative Sites" if he would select and pay money for one of three "Plans:" 12 months at $14.95 a month (described as "BEST VALUE SAVE 21%); 6 months at $16.95 a month; and, 3 months at $18.95 a month.  *Id.*

70. The inaccurate reporting by MyLife may have adversely affected Mr. Bonvie's ability to obtain employment as a writer; many of the contacts he made with prospective employers or clients have failed to respond during the time that MyLife has been profiling him, despite his having accompanied his applications for employment with substantial evidence of his qualifications.  The uncertainty over this also caused him a great deal of emotional distress and anxiety.

71. Defendant improperly used Mr. Bonvie's name and likeness to its commercial advantage without his consent, disclosed private financial and other information about Mr. Bonvie to

the general public and improperly furnished reports about Mr. Bonvie with inaccurate income, net worth and other information, harming his reputation.

72. Both Plaintiffs sustained particularized and concrete harm as a result of the actions of Defendant. Their statutorily granted rights to remain free of false, deceptive and misleading representations concerning their interest in their privacy and their personal information were all violated by Defendant. These rights were designed by the United States and by New Jersey to protect against invasions of individual privacy, and Defendant deprived Plaintiffs of those rights. Plaintiffs' property interests in their names and/or likenesses was wrongfully appropriated, and their privacy was invaded, causing significant upset and emotional distress.

73. Defendant attempts to avoid complying with the FCRA by displaying a notice on its website wherein it advises users to affirm they will not use MyLife's information for any purpose that would require FCRA compliance.

74. However, this attempt to compel waiver of FCRA rights underscores that MyLife knew or should have known that its actions violated the FCRA. Defendant could have taken steps necessary to bring their activity into compliance with the FCRA and other applicable laws, but knowingly chose not to do so and failed to adequately review its actions to ensure compliance with the law.

**V.    CLASS ACTION ALLEGATIONS**

75. Plaintiffs bring this action individually and as a class action, pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, on behalf of the following Classes:

    a. All persons in the United States and its Territories about whom Defendant, beginning two years prior to the filing of this Complaint and continuing through the date of judgment, prepared a report listing a net worth.

  b. All persons in the United States and its Territories about whom Defendant, beginning two years prior to the filing of this Complaint and continuing through the date of judgment, prepared any report with the notation that the report "may have" arrest or criminal records, sex offender records or eviction records when, in fact, the report does not contain any such records.

  c. All persons with a street address in the State of New Jersey about whom Defendant, beginning two years prior to the filing of this Complaint and continuing through the date of judgment, prepared a report identifying the subject of the report with a photograph.

  d. All persons with a street address in the State of New Jersey about whom Defendant, beginning two years prior to the filing of this Complaint and continuing through the date of judgment, prepared a report identifying the subject of the report by at least a first and last name.

  e. All persons with a street address in the State of New Jersey about whom Defendant, beginning two years prior to the filing of this Complaint and continuing through the date of judgment, prepared a report identifying any income or religion for the subject of the report.

  f. All persons with a street address in the State of New Jersey about whom Defendant, beginning six years prior to the filing of this Complaint and continuing through the date of judgment, prepared a report including the subject's photograph, income, net worth or religion.

  76. Excluded from the Classes are: (a) all federal court judges who preside over this case, their clerks and their family members; (b) Defendant's employees, officers, directors, agents, attorneys, representatives and their family members; and, (c) Plaintiffs' counsel.

77. The Classes are so numerous that joinder of all members is impracticable. This Complaint concerns internet postings and reports regarding thousands of individuals. Although only Defendant knows the precise number of Class members, Defendant boasts on its website that it publishes reputational information regarding millions of people nationwide.

78. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class members. Some of the principal common questions include:

    a. Whether Defendant MyLife is governed by the requirements of the FCRA;

    b. Whether the FCRA was violated by Defendant MyLife;

    c. Whether MyLife's conduct was willful;

    d. Whether the actions and omissions of the Defendant as described above violated the New Jersey Truth in Consumer Contract Warranty and Notice Act;

    e. Whether Defendant violated the right of privacy of Plaintiffs and Class members and wrongfully appropriated the names, likenesses and personal identifying information without their permission, for commercial purposes;

    f. How much money Defendant has collected from consumers and other third parties during the class period;

    g. How much income Defendant earned from any source as a result of the unauthorized use by Defendant of the names, likenesses and personal identifying information of consumers; and,

    h. Whether the actions and omissions of the Defendant as described above invaded Plaintiffs' and Class members' right of privacy by publicly disclosing private facts about them such as their photograph, income, net worth or religion.

79. Plaintiffs' claims are typical of the claims of the Classes, which all arise from the same operative facts and are based on the same legal theories.

80. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are committed to vigorously litigating this matter and have retained counsel experienced in handling class actions and claims businesses that gather and publish reports on consumers and cases involving unfair and deceptive practices. Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this claim.

81. This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Class, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

82. A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the maximum statutory damages in an individual action under the FCRA are $1,000.00. Management of the Class claims is likely to present significantly fewer difficulties than those presented in many class actions. The identities of the Class members may be obtained from Defendant's records.

## VI.    CLAIMS

### COUNT ONE

### Fair Credit Reporting Act – 15 U.S.C. § 1681e(b)

83.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

84.    Each Plaintiff is a "consumer" within the meaning of section 1681a(c) of the FCRA.

85.    Defendant MyLife is a "consumer reporting agency" within the meaning of section 1681a(f) of the FCRA.

86.    Section 1681e(b) of the FCRA requires that, "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

87.    MyLife fails to follow reasonable procedures to assure maximum possible accuracy of the reports it prepared about the Plaintiffs, providing inaccurate net worth, religion, national origin, income and other information.

88.    As a result of the violations of the FCRA, Defendant MyLife is liable to the Plaintiffs and members of the Class for actual damages, statutory damages, punitive damages, costs and attorney's fees.

### COUNT TWO

### New Jersey Truth-in-Consumer Contract, Warranty and Notice Act

89.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

90.    Plaintiffs bring this cause of action under the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. § 56:12-14 *et seq*. ("TCCWNA"), on Plaintiffs' behalf and on behalf of the Class.

91. TCCWNA provides in relevant part that "(n)o seller … shall in the course of his business offer to any consumer or prospective consumer or enter into any written contract or give or display any written consumer warranty, notice or sign ... which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller ... as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed."   N.J.S.A § 56:12-15.

92. Plaintiffs are each a "consumer" within the meaning of TCCWNA.

93. Defendant MyLife is a "seller" within the meaning of TCCWNA.

94. MyLife's internet postings, described above, display notices that are false, deceptive and misleading in violation of clearly established federal and New Jersey law.

95. MyLife's activities as described herein violate federal and New Jersey law as unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations.

## COUNT THREE

### New Jersey Right of Publicity

96. Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

97. Plaintiffs bring this cause of action pursuant to the New Jersey common law granting its citizens the right of privacy and prohibiting the wrongful appropriation of a person's name or likeness, on Plaintiffs' behalf and on behalf of the Class.

98. In New Jersey, "[t]he right of publicity is a concept which has evolved from the common law of privacy and its tort 'of the appropriation, for the defendant's benefit or advantages, of the plaintiff's name or likeness.'  The term 'right of publicity' has since come to signify the right of an individual, especially [but not exclusively] a public figure or a celebrity, to control the

16

commercial value and exploitation of his name and picture or likeness and to prevent others from unfairly appropriating this value for their commercial benefit. The idea generally underlying an action for a right of privacy is that the individual has a right personal to him to be let alone and, thus, to prevent others from invading his privacy, injuring his feelings, or assaulting his peace of mind. In contrast, underlying the right of publicity concept is a desire to benefit from the commercial exploitation of one's name and likeness." *Presley's Estate v. Russen,* 513 F. Supp 1339, 1353 (D.N.J. 1981) (citations omitted).

99.     Under New Jersey law, "the goal of maintaining a right of publicity is to protect the property interest that an individual gains and enjoys in his identity through his labor and effort ... the right of publicity is designed to encourage further development of this property interest." *Hart v. Electronic Arts, Inc.*, 717 F.3d 141, 151 (3d Cir. 2013); *Faulkner v. Hasbro, Inc.*, 2016 WL 3965200, *1-2 (D.N.J. July 21, 2016) (Hayden, J.)

100.    Plaintiffs and those similarly situated had a legally protected property interest in their names and likenesses.

101.    Plaintiffs and those similarly situated had a reasonable expectation of privacy regarding their names and/or likenesses, and that such information would not be broadcast to the world without their consent for commercial purposes and for the sole financial benefit of Defendant.

102.    MyLife intentionally and without their permission intruded upon the privacy of the Plaintiffs and members of the Class and disclosed to anyone willing to pay, the names and/or likenesses of the Plaintiffs and those similarly situated.

103. MyLife used the names and/or likenesses of the Plaintiffs and members of the Class for a predominantly commercial purpose, resulting in damages to consumers equal to the income that MyLife generated by the unauthorized use of such information.

104. MyLife elevated its own commercial interests over the personal privacy interests of the Plaintiffs and those similarly situated.

105. MyLife's conduct as described herein was so serious in nature and scope as to constitute an egregious breach of social norms.

106. MyLife's conduct affected Plaintiffs and those similarly situated in a personal and individual way.

## COUNT FOUR

### Invasion of Privacy- Public Disclosure of Private Facts

107. Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

108. "New Jersey law recognizes four distinct kinds of invasion of privacy claims involving four different privacy interests" including "public disclosure of private facts ..." *Capers v. FedEx Ground*, 2012 WL 2050247, at *5 (D.N.J. June 6, 2012) (citation omitted).

109. "In order to state a claim for public disclosure of private facts, a plaintiff must establish that private matters were revealed, that dissemination of such facts would be highly offensive to a reasonable person, and that there is no legitimate public interest in the disclosure." *Id*. at *5.

110. Defendant revealed to the public on the MyLife website private matters about Plaintiffs, including but not limited to income, net worth and religion.

111. The disclosure by Defendant of private matters about Plaintiffs is highly offensive to reasonable persons, including Plaintiffs.

112. There is no legitimate public interest in the disclosure of private matters by Defendant to the world at large.

113. Defendant acted intentionally or recklessly to publish to the world at large private facts about Plaintiffs exclusively for Defendant's economic benefit, to the detriment of Plaintiffs.

114. Defendant acted intentionally or recklessly in deliberate disregard of the damages to Plaintiffs including but not limited to embarrassment and damage to the reputation of the Plaintiffs that would be caused by its activities as described herein.

115. Defendant's actions proximately caused damages to Plaintiffs.

## VII. JURY TRIAL DEMAND

116. Plaintiffs demand trial by jury as to all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that relief be granted as follows:

A. That an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their counsel to represent the Classes;

B. That judgment be entered against Defendant for actual damages;

C. That judgment be entered against Defendant for statutory damages;

D. That judgment be entered against Defendant for treble damages;

E. That judgment be entered against Defendant for punitive damages;

F. That the Court enjoin MyLife from collecting and disseminating the names, likenesses and other personal identifying information of Plaintiffs and those similarly situated, without their express permission;

G. That the Court order MyLife to account for and disgorge all profits realized from MyLife's invasion of the privacy of the Class members;

    H.    That the Court award costs and reasonable attorneys' fees; and,

    I.    That the Court grant such other and further relief as may be just and proper.

Respectfully submitted,

**FRANCIS MAILMAN SOUMILAS, P.C.**

Dated: January 29, 2020    BY:   <u>*/s/ John Soumilas*</u>
James A. Francis
John Soumilas
David A. Searles (*pro hac vice* forthcoming)
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(215) 735-8600

*Attorneys for Plaintiffs and the Classes*